UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CASEY FARLEY, et al.,<br><br>　　　　　　　　Plaintiffs,<br><br>vs.<br><br>DIRECTOR JOSH TEWALT,<br><br>　　　　　　　　Defendant. | Case No. 1:21-cv-00409-BLW-DKG<br><br>**REPORT AND RECOMMENDATIONS AFTER SPEARS HEARING** |

Pursuant to the Order of United States District Judge B. Lynn Winmill, who presides over this case, United States Magistrate Debora K. Grasham held a Spears hearing in the Idaho Maximum Security Institution ("IMSI") courtroom. All Plaintiffs who desired to attend were transported to the hearing, which was conducted in two phases. The first phase, held on the morning of December 12, 2023, consisted of the Idaho deputy attorneys general laying foundation for their exhibits, derived from the Martinez Report and Supplement, by questioning the prison officials responsible for researching and aiding in preparation of those documents.

The second phase of proceedings, where Plaintiffs gave testimony about their conditions of confinement and injuries, was held on December 12 and 13, 2023. The court reporter has prepared and lodged the transcript of the hearing, a copy of the transcript is

being made available to Plaintiffs at the Legal Resource Centers at the facilities where Plaintiffs now reside, and the Court has reviewed the transcript. *See* Dkts. 135, 136.[1]

Plaintiffs raised a meritorious objection to the Martinez Report and Supplement, stating that they have not been permitted to review the portions of the report and records that were filed under seal for security and privacy reasons. Because the truth of the Martinez Report and Supplement is not at issue in the pleadings stages of proceedings, the Court acknowledged the objections at the hearing but decided no further action would be taken. After a thorough review of this matter, the Court finds that the only exception to its decision to not rely on the sealed exhibits is that, as to the sexual assaults claims, the Court first decided that Plaintiffs have failed to state a claim, as discussed below, and then it reviewed the sealed sexual assault records provided by Idaho Department of Correction ("IDOC") to determine whether that additional evidence would enable Plaintiffs to state a claim.

The Court will refer only briefly to the Martinez Report and will rely primarily on the testimony of Plaintiffs. The Court also relies on Defendants' Spears hearing exhibits to the extent that they support the existence of incidents of inmate-on-inmate violence.

In addition, the Court did not order a transcript of the first phase of proceedings from the court reporter. If the untranscribed portion of the hearing becomes necessary to later phases of the proceedings, a party can request that it be transcribed.

Accordingly, the Court issues the following Report and Recommendations.

---

[1] References to page numbers of the transcript are to the original transcript numbering, rather than ECF page numbering.

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 2**

## REPORT AND RECOMMENDATIONS

### 1. Introduction and Summary

This case, originally filed on October 18, 2021, has been limited to Eighth Amendment failure to protect and humane conditions of confinement claims arising from prison officials' allegedly wrongful acts in the J-block protective custody ("PC") unit of IMSI between 2021 and the present day.[2] The J-block PC unit houses a total of 64 inmates. *See* Warden Timothy Richardson Declaration, Dkt. 57-2, p. 5.

The Spears hearing testimony showed that the inmates have stated several cognizable claims for past injuries and should be permitted to the next stage of proceedings. However, whether they may proceed beyond the next stage may be determined by whether they have stated sufficient physical injuries to support damages claims, whether they have exhausted their administrative remedies, and whether their claims are not susceptible to qualified immunity in the aftermath of the COVID-19 pandemic. The Spears hearing testimony also showed that the allegedly unconstitutional housing conditions in J-block have improved to the extent that it appears no inmate currently being housed in J-block is alleging facts supporting a viable claim for current or future injunctive relief.

Earlier in this matter, Judge Winmill dismissed the claims of various Plaintiffs for failing to follow court orders; most appeared to have abandoned their claims. At the time

---

[2] The following types of claims alleged in this action have been severed into separate cases: claims asserting that assaults that occurred in other housing units of IMSI or other facilities such as Idaho State Correctional Center ("ISCC"), claims about conditions of confinement in other housing units or facilities, and claims that prison officials, attorneys, or judges prevented inmates from having access to another inmate for legal advice.

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 3**

of the Spears hearing, nine Plaintiffs had claims that remained for adjudication: Casey Farley, Matthew Kittrell, Erik Jon Payne, Kylie Hodges-Foote, Berin Laymon, Daniel Morgan, Joshuah Lincoln, Cody Willard, and Johnothon Morrison. Because Casey Farley and Cody Willard refused to testify about their claims at the Spears hearing or file an amended complaint in lieu of their testimony, as ordered by Judge Winmill, this Court's recommendation will be that their claims be dismissed without prejudice. *See* Dkt. 136, pp. 234-237.

The inmates testified about the following common problems that form the basis of Eighth Amendment civil rights claims: (1) that, after housing arrangements were changed to an open tier in J-block, it became was excessively violent; (2) despite the fact that prison officials were aware that an inmate named Kinner[3] openly verbally threatened to kill other inmates and prison officials repeatedly found Kinner in possession of homemade metal knives called "shanks," prison officials continued to return Kinner to J-block rather punishing him or sending him to a closed custody unit; (3) that prison officials knew that the showers were unsupervised—a situation that encouraged aggressive inmates to attack other inmates in the showers; and (4) that prison officials permitted persistent lock-ins that deprived inmates of exercise.

Other common problems inmates testified about that do not rise to the level of a constitutional violation was that during times of lockdown, prison officials did not permit sufficient dayroom/indoor exercise time, and the prison officials permitted inmates to

---

[3] The transcript uses the spelling "Kenner," but IDOC records show the correct spelling is "Kinner."

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 4**

shower only every third day. The Court recommends that these claims be dismissed for failure to state a claim.

For the reasons set forth below, the Court recommends that the remaining seven inmates be permitted to remain as co-plaintiffs in this action for failure to protect claims and deprivation-of-exercise claims for the time period from 2021 to 2022.

However, because the parties' medical claims, mental health claims, and sexual-orientation-based claims are personal and different from each other, and because it is not appropriate for inmates to possess each other's medical, mental health, and prison records, the Court recommends that any Plaintiff who desires to proceed on these claims be required to file a separate amended complaint more fully describing these particular claims, and the complaints be severed into separate actions, a process which preserves the earlier filing date of the original Complaint in this action as the statute of limitations date.

Finally, because no injunctive relief claims remain, and because the requirements for a class action case are not met, the Court recommends that a class action not be certified.

## 2. Parameters and Use of Spears Hearing Testimony

Under the Prison Litigation Reform Act (PLRA),[4] all prisoner and in forma pauperis complaints must be screened by the Court. Claims that are frivolous or malicious, fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief must be summarily dismissed. 28 U.S.C. §§ 1915 & 1915A. In addition, the Court retains screening authority to dismiss claims at any time

---

[4] Pub. L. No. 104-134, 110 Stat. 1321, *as amended*, 42 U.S.C. § 1997e, *et seq.*

during the litigation under §1915(e).[5]

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint fails to state a claim for relief under Rule 8 if the factual assertions in the complaint, taken as true, are insufficient for the reviewing court plausibly "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To state an actionable claim, a plaintiff must provide "enough factual matter (taken as true) to suggest" that the defendant committed the unlawful act, meaning that sufficient facts are pled "to raise a reasonable expectation that discovery will reveal evidence of illegal [activity]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 US. at 678 (citing *Twombly*, 550 U.S. at 555).

The Court has authority to seek additional information from the parties to assess Plaintiffs' claims during the screening process. The Court may exercise its discretion to require an amended complaint, a Martinez report, and/or a Spears hearing.

In *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985),[6] the court authorized an evidentiary hearing in the nature of a Federal Rule of Civil Procedure Rule 12(e) motion for a more definite statement. "The Spears hearing is neither a trial on the merits nor a

---

[5] Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss [an in forma pauperis] case at any time if the court determines that . . . the action or appeal . . . is frivolous or malicious. . . [or] fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B).

[6] *Spears* was overruled on other grounds by *Neitzke v. Williams*, 490 U.S. 319, 324 (1989) (a complaint that fails to state a claim under Rule 12(b)(6) is not necessarily frivolous within the meaning of § 1915(d)).

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 6**

mini-trial; rather, it aims to flesh out the allegations of a prisoner's complaint to determine whether in forma pauperis status is warranted or whether the complaint, lacking an arguable basis in law or fact, should be dismissed summarily as malicious or frivolous under section 1915(d)." *Eason v. Holt*, 73 F.3d 600, 602 (5th Cir. 1996).

A plaintiff's relevant testimony during the Spears hearing, as it relates to essential allegations, are considered incorporated into the plaintiff's complaint. *Id*. at 603. The relevant Spears testimony remains a part of the pleadings even if a plaintiff later amends the complaint and the original written complaint is superseded by the amendment. *Id*.

In a Spears hearing, the judge must accept as true the complaint's well-pleaded or articulated facts in determining whether the plaintiff has stated plausible claims under prevailing screening standards. *Id*. at 603. The district court may make only limited credibility determinations. *Cay v. Estelle*, 789 F.2d 318, 326–27 (5th Cir. 1986), *overruled on other grounds, Denton v. Hernandez*, 504 U.S. 25 (1992). The court may also require the defendants in prisoner rights cases to construct an administrative record to assist the court in determining whether the complaint is frivolous. *See Norton v. Diazene*, 122 F.3d 286, 292 (5th Cir. 1997), citing *Martinez v. Aaron*, 570 F.2d 317, 319 (10th Cir. 1978). Here, the Martinez Report fulfilled that function.

### 3. Procedural History

At the start of this case, twenty-seven inmates signed the Complaint, complaining of prison conditions and asking for class action status: Jody Carr, Camron Belcher, Ryan Cunningham, Matthew Kitrell, Jeremy J. Brown, Shawn Michael Pruett, Mark Dixon, Nicholas Shuff, John Jones Jr., Casey Farley, David Peter, Derek Sanders, Brent

Messinger, Jordan Goeckner, Omar Padilla, Jeremy Wilkinson, Robert J. Sams, Erik Jon Payne, Chris Stewart, Ronald Baker, Karden Tullis, Andrew Perez, Gunner Weir, Cody Willard, Ignacio Aguilar Jr., Randall Erickson, and Shawn Michael Pruett.

Judge Winmill required the filing of amended complaints, severed certain claims, ordered a Martinez report, and then ordered a Spears hearing. Nine inmates attended the first phase of the Spears hearing; in the second phase, only seven testified in support of their pleadings.

### 4. Failure to Protect Claims

#### A. *Standard of law*

To state an Eighth Amendment "prison conditions" claim based on failure to prevent harm, an inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates" and to "to protect prisoners from violence at the hands of other prisoners." *Id*. at 832–833. When a prison official is deliberately indifferent to a substantial risk of serious harm to an inmate, that conduct violates the Eighth Amendment. *Id.* at 828. "Deliberate indifference" requires plausible facts alleging that the official was "subjectively aware of the risk." *Id*. at 829.

For example, in *Berry v. Sherman*, 365 F.3d 631 (8th Cir. 2004), the plaintiff alleged that prison officials had failed to protect him from an attack by another inmate. But before the attack, Berry had voiced no complaints about his cellmate to prison officials except about the cellmate's personal hygiene, and Berry had refused protective custody five times.

*Id.* at 633. The appellate court determined that "[t]he undisputed evidence indicates that no one, including Berry, believed he was at 'substantial risk of serious harm'"; accordingly, prison officials were entitled to qualified immunity. *Id.* at 634.

B. *Allegations of removing red flags from inmate files and opening tier*

The protective custody or "PC" unit "is a housing assignment that separates an individual from the general population for that individual's safety." Richardson Decl., Dkt. 57-2, p. 3. Defendants explained that "J-1 block is all protective custody, and all residents that live in protective custody may generally be housed on any walk as long as there is not a safety concern in place or reason that they should not live around another offender in protective custody." Martinez Report, Dkt. 57, p. 5. A "walk" is a grouping of cells (typically 8 cells) that are allowed to come out together for their dayroom and/or recreation time. Nathan Roe Decl., Dkt. 57-2, p. 11.

Most Plaintiffs testified that, in about October 2021, Warden Richardson held a meeting with all inmates on the protective custody tier and announced a "no red flag policy," meaning that prison officials would move the inmates anywhere on the tier without regard to whether there was a documented safety reason to keep certain inmates apart. Lincoln, Dkt. 135, pp. 55-56. Inmate Lincoln reported that the Warden said that they all had previously assaulted someone at some point to be in prison and that they could be victimized in prison. Dkt. 135, pp. 55-56. Warden Richardson allegedly "basically said this was a men's prison, and he remembered when it would police itself, pretty much, that it would take care of their own issues and just figure it out." Lincoln, Dkt. 135, p. 58. Lincoln interpreted this speech as saying "Pretty much, just handle your own business." *Id.*

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 9**

Inmate Kitrell said the Warden "basically told us that if we're going to do something, get away with it; we're grown men, we're going to fight; go fight in the showers so they don't have to respond." Dkt. 135, p. 221. Kitrell echoed Lincoln's recollection—"there would no longer be red flags, … if we want to break the rules, do it without the cops finding out…." Dkt. 135, p. 187. Kitrell took the Warden's announcement to mean, "They don't give a shit. Excuse my language. That's the severity of the situation." Dkt. 135, p. 221.[7]

After this meeting, the Warden "opened up the whole tier" and did away with separate walks. Lincoln, Dkt. 135, pp. 55-56. Warden Richardson says that he expanded PC from 8 cell blocks to 16, all designated one level. *Id.*; Richardson Decl., Dkt. 57-2, p. 6. After the opening of the tier, "that's when a lot of the stuff really started happening," including "a lot of fights." Lincoln, Dkt. 135, pp. 55-56. For example, Kitrell was assaulted by former plaintiff Erickson "right after they opened the bottom walks and the top walk." Dkt. 135, p. 223. Kitrell testified that the effect of the meeting on the inmate population,

---

[7] In contrast, Warden Richardson declared:

> Specifically to this case I do not recall any statements I made of a "No Red Flag Policy" and "men fight, get over it." I do vaguely recall statements made during a tier meeting in or around October 2021. The general message of which was residents housed within the Protective Custody environment are here for a reason of their choosing, either by crime, prior gang affiliation, etc., and that no resident within this population is in need of such housing over the priority of another resident. Everyone within this population needs to find ways to reside together.

Dkt. 57-2, p. 4. For the purposes of the Spears hearing, the Court relies upon the inmates' versions.

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 10**

was: "People got the case of the F-its. They don't care. Okay. As long as we're smart about it, we can get away with whatever we want." Dkt. 135, p. 223.

He saw more violent actions, as well as more alcohol and drug use—"people thought they could get away with whatever they want." *Id.*, pp. 223-224.

The data for all altercations known to IDOC officials from Week 31 of 2021 through Week 52 of 2022, was provided with the Martinez report, and again in exhibits at the Spears hearing. Some of the IDOC data matched the altercations Plaintiffs identified. *See* Martinez Report, Dkt. 57 to 57-7. The data and testimony showed the following:

In Week 31 of 2021 (08/01/21), inmates Veley and Hernandez fought. No altercations were reported in Weeks 32, 33, 34, 35, 36, 37, 38, and 39.

The month of October 2021—pinpointed as the beginning of the open tier era—spanned Weeks 40 to 44. In Week 40 (10/06/21), Gallegos and Anaya fought in the shower (*see* Morrison, Dkt. 136, p. 255). No altercations were reported in Weeks 41, 42, 43, 44, 45 or 46. In Week 47 (11/21/21), Farley (plaintiff/identified aggressor) and Dixon fought (Lincoln, Dkt. 135, p. 17; Payne, Dkt. 136, p. 342; Exhibit 4).[8] In Weeks 48, 49, 50, 51, and 52, no altercations were reported.

In Week 1 of 2022, no altercations were reported. In Week 2 (1/14/22), Baker and Fotsch fought (Exhibit 26, 27).

Between Weeks 3 and 10, one altercation occurred every other week in J-block: in Week 4 (1/28/22), Padilla (plaintiff) and Aguilar fought in their cell (Payne, Dkt. 136, p.

---

[8] All exhibits referred to are Defendants' Spears hearing exhibits; the same exhibits were attached to the Martinez report.

315; Exhibit 24); in Week 6 (2/10/22), Kinner and Farley fought (Kitrell, Dkt. 135, pp. 197, 200; Laymon, Dkt. 135, p. 143; Lincoln, Dkt. 135, pp. 199-200; Hodges-Foote, Dkt. 135, p. 98; Exhibit 1); in Week 8 (2.26.22), Roa (former Plaintiff) and Haight fought (Exhibit 16); in Week 10 (3/6/22), inmate Lewis threw an unknown liquid on Kinner. No altercations were reported in Weeks 3, 5, 7, and 9.

In Week 11 (3/16/22), Onge attacked Kinner with a weapon, but was dropped before it was used on Kinner (*see* Hodges-Foote, Dkt. 135, pp. 95-96; *see* Lincoln, Dkt. 135, p. 19-20, 32; Exhibit 40). No altercations occurred in Weeks 12, 13, and 14.

In Week 15 (4/11/22), Williams attacked Kitrell (plaintiff) (Exhibit 25). In Week 16 (4/20/22), Farley (plaintiff) and Laymon (plaintiff) fought, in a battle deemed mutual combat, (Kitrell, Dkt. 135, p. 197; Exhibit 3). In Week 18 (5/7/22), Baker and Williams fought (Kitrell, Dkt. 15, p. 194; Exhibit 28). In Week 20 (5/19/22), Anderson and Williams fought (Kitrell, Dkt. 15, p. 194). In Week 21 (5/27/22), Anderson and Grubbs fought, and Kinner attacked Officer Garcia (5/26/22); Exhibit 33. No altercations were reported in Weeks 17, 19, or 22.

In Week 23, the first full week of June 2022, altercations occurred weekly, sometimes twice weekly: in Week 23(6/3/22 and 6/5/22), Haight and Conaty fought and Rodgriguez-Romero and McKenzie fought; in Week 24 (6/15/22), Fotsch and Ball fought in the dayroom (Lincoln, Dkt. 135, p. 24); in Week 25 (6/19/22 and 6/24/22), Bowie and Roa (former plaintiff) fought (Exhibits 17, 18) and Garcia and Hodges-Foote (plaintiff) fought (Exhibit 31); and in Week 26 (6/2/22), McKenzie and Allen fought.

No altercations were reported in Weeks 27, 28, or 29, which spanned June 26 to July 23. In Week 30 (7/27/22), there was a potential altercation involving Juarez, Morgan, and Hastings (Exhibit 40). No altercations were reported in Weeks 31, 32, 33, 34, and 35. In Week 36 (9/10/22), McKenzie and Escamilla fought. In Week 37 no altercation was reported. In Weeks 38, 39, and 40, one altercation occurred each week: in Week 38 (9/24/22), Morgan and Escamilla; fought; in Week 39 (10/1/22), Wier and Bennett fought; in Week 40 (10/6/22), Anaya and Conaty fought.

In Week 41, the last week reported, two altercations occurred: (10/15/22) England and Morgan fought and (10/16/22) Johnson and Parker fought.

The following incidents, reported by the inmates in their pleadings or at the hearing, do not appear in the IDOC records provided. Farley alleged he fought with Veley; former plaintiff Erickson allegedly fought with Belcher. No records were found, but that could mean simply that the fights were not reported. *See* Exhibits 2, 30. Neither Farley nor Erickson testified.

Lincoln testified that an inmate named Fred made alcohol and repeatedly pressed Lincoln to drink some, so he finally did. Then Fred told Lincoln to give him his gabapentin prescription pain pills in return for the alcohol, but Lincoln refused. The two fought in the shower, ceasing on their own when they were winded. Lincoln suffered a bloody mouth and a bruised eye. Dkt. 135, pp. 10-11. Kitrell testified that he was assaulted by J-block cellmates four or five times, Dkt. 135, p. 216, but did not report them.

No inmate testified that a red flag actually was removed from his file and that any consequence came of the removal of the red flag. Rather, the inmates testified that, when

they actually reported feeling a threat of harm, correctional officers would immediately remove them from any potential harm by temporarily transferring them to segregation pending investigation, discussed in detail below in the section addressing exhaustion of administrative remedies.

## C. *Discussion of claims of Plaintiffs who suffered physical injury*

At this stage of litigation, there are no statistics from other maximum security prisons or national prison organizations to gauge whether the violence in the J-block protective custody unit was abnormal. There are no records showing whether merging separate protective custody walks into one tier was a well-thought-out experiment or a change executed with deliberate indifference. No one knows at this point whether the new configuration had been successful in other prisons, or what information the Warden relied upon for his decision here.[9]

Plaintiffs universally testified that they lived in fear of harm on J-block during the open tier era. Hodges-Foote said: "I don't understand how a tier that's supposed to be PC can have that many violent occasions or … issues, when it is supposed to be protective custody." Dkt. 135, p. 99. Liberally construing the pleadings (including the hearing testimony), the Court concludes that the Plaintiffs who were actually injured in an altercation and believe they can causally link their injury to prison officials' alleged

---

[9] At least part of the Warden's speech and philosophy motivated J-block inmates to modify their behavior to earn more dayroom time after the separate walks were reinstituted. *See* Morrison, Dkt. 136, pp. 285-287.

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 14**

deliberate indifference to a high risk of inmate-on-inmate violence should be permitted to proceed on Eighth Amendment failure to protect claims.

D. *Discussion of claims of Plaintiffs who suffered emotional injury*

As to those Plaintiffs who were not involved in a physical altercation, the Court recognizes that the law provides for the following protection from risk of harm:

> One does not have to await the consummation of threatened injury to obtain preventive relief. Consistent[] with this principle, a subjective approach to deliberate indifference does not require a prisoner seeking a remedy for unsafe conditions to await a tragic event such as an actual assault before obtaining relief.

*Farmer*, 511 U.S. at 845 (1994) (internal citations, punctuation, and alterations omitted). That is, a claim for a "threat of harm" is viable as an injunctive relief claim to prevent prospective (future) harm.

However, because here, the claims are for past injury, those Plaintiffs who testified that they suffered only emotional distress- and anxiety-type injuries as a result of the increased risk of violence in their housing unit should be permitted to proceed only if they can show that those injuries equated to more than a *de minimis* (minimal) physical injury under 42 U.S.C. § 1997e(e). *Oliver v. Keller*, 289 F.3d 623 629 (9th Cir. 2002). Section1997e(e) provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Congress did not "specify the type, duration, extent, or cause of 'physical injury' that it intended to serve

as a threshold qualification for mental and emotional injury claims." *Jackson v. Carey,* 353 F.3d 750, 758 (9th Cir. 2003) (citing *Oliver,* 289 F.3d at 623).

Courts have held that "anxiety, insomnia, depression, [and] hopelessness" are not enough to meet § 1997e(e). *Cyrus v. Covello*, No. 223CV01384JDPPC, 2023 WL 8452423, at *1 (E.D. Cal. Dec. 6, 2023). Court have also consistently rejected claims that the physical manifestations associated with emotional distress, such as loss of appetite, headaches and sleeplessness are enough to establish a physical injury. *See Stanley v. United States*, No. 1:12CV35, 2012 WL 6924168, at *2 (N.D.W. Va. Oct. 24, 2012), *report and recommendation adopted*, No. 1:12CV35, 2013 WL 256023 (N.D.W. Va. Jan. 23, 2013); *Grainger v. Fed. Bureau of Prisons*, 2009 WL 47217 at *3 (S.D. Tex. Jan. 6, 2009); *Chatham v. Adcock*, 334 Fed. Appx. 281, 285 (11th Cir. 2009) (unpubl.) (claims of anxiety, nightmares, and hallucinations are not sufficient to satisfy § 1997e(e)).

Similarly, the *fear* of physical harm does not satisfy the requirement of a physical injury. *See Chappell v. Fleming,* 2014 WL 793986, *5 (E.D. Cal. Feb. 26, 2014) (concluding that prisoner did not satisfy physical-injury requirement by alleging that, after defendant prison guards publicly announced he had a prior rape conviction, he suffered fear that other inmates would assault him), *R & R adopted,* 2014 WL 1270612 (E.D. Cal. Mar. 26, 2014); *see also, e.g., Chanell v. Multnomah County,* 141 F.Supp.2d 1046, 1053 (D. Or. 2001) (concluding that Plaintiff's allegations that he was put at increased risk of violence by other inmates by defendants' "double bunking" practices, without alleging a physical injury, "does not equate with actual physical injury."). *Vega v. Nunez*, No. LA CV 13-09530-VBF-E, 2014 WL 1873265, at *7 (C.D. Cal. May 8, 2014).

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 16**

While these emotional injury claims may be dismissed for failure to meet the requirement of § 1997e(e) in the next stage of proceedings, the Court recommends that any Plaintiff who has facts showing that he suffered a serious physical manifestation of an emotional distress-type injury that can be equated with a physical injury be permitted to proceed past the pleading stage. Those who review their allegations and conclude that they cannot meet that requirement should be permitted to voluntarily dismiss their claims.

In addition to the issues that may result in dismissal set forth above, the procedural hurdle of exhaustion of administrative remedies may block some or all of Plaintiffs' claims, but that cannot be decided at the pleading stage. A separate section addressing exhaustion is set forth below.

E.   *Claims for injunctive relief for failure to protect violations*

Plaintiffs should not be permitted to proceed on present or future Eighth Amendment failure to protect claims because there was insufficient testimony to show that the level of violence that existed during the open tier era in J-block exists today.

Kitrell reported that, following the increase in "alcohol, drug use, and violence" and "multiple incidents" that the opening of the PC tier brought—marking a time when "people thought they could get away with whatever they want"—prison officials changed the PC tier back to the way it used to be. Dkt. 135, pp. 223-24. Lincoln similarly testified that, after a time under the new philosophy and housing plan announced by the Warden, "they separated the top tier from the bottom tier. And then it ended up on four walks again." Dkt. 135, p. 56. Warden Richardson also said that continued violence and other rule violations in the protection custody unit caused the "the population to return to eight (8) cell walks

which they are on as to date [12/8/22]." Richardson Decl., Dkt. 57-2, p. 6. Morrison

testified that the medium security protective custody unit now is housed at a medium-

security prison (ISCC Unit D-2 ), with only maximum security protective custody at IMSI

J-1. Dkt. 136, p. 284.

At the time of the Spears hearing in November 2023, only the following plaintiffs

were still housed on J-Block: Morrison, Farley (who refused to testify or file a second

amended complaint), and Willard (who refused to testify or file a second amended

complaint). Morrison testified that the Warden's advice to work out their problems among

themselves seemed to work:

> Q. But today, I want your thoughts about -- how would you
> describe the level of violence? And I'm talking about either
> the day room, the showers or the cells.
>
> A. There hasn't been -- we've actually got a lot of laid back
> people on our tier. Everyone has come to the agreement of
> like, hey, the more issues that you cause, it is affecting
> everybody. Like you have your issues, work it out, ask to be
> moved or something. We're all grown men here. We don't
> have to fight. We can talk about stuff.
>
> Q. So that's working?
>
> A. Everybody has a pretty good rapport right now. Of course,
> everybody is not going to get along with everybody. But, you
> know, they make the choice to stay away from each other.
> You know, hey, I …don't mess with that dude, I don't talk to
> that dude, I stay away, or whatever the situation may be.
>
> We have a pretty good staff right now, and everyone on the
> tier has a pretty good understanding. We're also trying to get
> to the point where we're open back up -- so we used to be
> open to where we were out four hours a day. So we -- when
> the bottom tier would be open the first half of the day for four
> hours, and then the top half would come out. And the next
> day, it would switch. So it hasn't been like that for a while

because of the violence and stuff like that. And so we're
trying to get -- we've all come together like, hey, you know,
we want more day room, right. We want more opportunity to
come out and see our family. Let's knock it off. Let's be
grownups here and -- you know, so it has been pretty -- it has
been really mild. There hasn't really been any issues.

Q. I was going to ask you, that was about the level of
violence. It sounds like you guys are at least maintaining and
it is okay?

A. Yeah.

Dkt. 136, pp. 285-287.

Because there was no testimony showing that there is a current problem with
excessive inmate-on-inmate violence in J-block, the Court recommends that Plaintiffs not
be permitted to pursue prospective injunctive relief claims.

F.    _Allegations that shower area is unsupervised and that prison officials_
      _ignored the known risk of inmate-on-inmate assaults in the showers_

Another variety of the Eighth Amendment failure to protect claim in the pleadings
is that prison officials ignored the known risk of inmate-on-inmate assaults in the showers.
Lincoln's testimony was that the Warden suggested inmates settle their differences by
physical violence in the showers so that officers would not know and would not have to
respond. Dkt. 135, p. 221. Even if this allegation about the Warden was ultimately rejected
by a jury, the testimony of several Plaintiffs made it clear that the shower is aggressive
inmates' fighting arena of choice, possibly because of different monitoring, and Plaintiffs
may be able to show that prison officials know that.

In response to the question, "It sounds like the showers are the places people go to
have fights?", Kitrell responded, "Oh, yeah. 100 percent." Dkt. 135, pp. 223-224. Inmate

Kinner "was caught on camera trying to hide in the shower to get people." Morrison, Dkt. 136, p. 255. Morrison testified: "There's been a few guys go in and fight in the shower…. And then they go out and clean themselves up. And nothing was done about that…. I think the cops just never knew, you know." Dkt. 136, pp. 254-255.

One of the more serious shower altercations was between Randall Erickson (a former plaintiff) and Kitrell (a plaintiff). Kitrell testified that he felt he had settled an issue with Erickson, but then Erickson approached him in the shower. Kitrell suffered a black eye and a broken nose in the assault. "If I hadn't gone in there, it would have been a lot worse than it was," Kitrell testified. Dkt. 135, pp. 223-224.

Another serious fight in the shower happened between Kinner and Farley. Kitrell testified that, when Kinner and Farley began fighting in the shower, a correctional officer was upstairs. And when he heard Farley yelling, he came running down and pulled him out. Hodges-Foote, Dkt. 135, p. 98; Kitrell, Dkt. 135, p. 197.

Although Defendants point to surveillance video—showing Kinner beckoning and Farley following Kinner into the showers—to contradict Farley's claim that Kinner "forced" Farley into the shower, *see* Defendants' Exhibit 1, "force" appears to be a relative term in prison. For example, as stated above, Kitrell testified he felt compelled to engage in a fight with Erickson in the shower to avoid a future attack. Kitrell, Dkt. 135, pp. 223-224.

Some of the unreported shower altercations discussed by Plaintiffs were less serious. Lincoln testified: "I've seen people come out of the shower and stuff over the poker table and end up with little bruises and stuff on them, which is stupidity." Dkt. 135, p. 37.

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 20**

Lincoln continued: "But it never turned into anything super big like it did with the shank or Garcia [the officer], the way [Inmate Kinner] went after Garcia." *Id*. p. 37; Exhibit 33.

The Court concludes that Plaintiffs have stated a claim upon which they can proceed regarding an allegedly unreasonable risk of assault in the shower area. However, the same admonitions apply: (1) because there is no testimony showing a current or future threat of harm, no prospective injunctive relief claims lie; (2) those Plaintiffs who did not suffer an obvious physical injury should be required to overcome § 1997e(e), and (3) Plaintiffs later may face a dismissal motion asserting they did not exhaust their administrative remedies and have no adequate legal excuse for failing to do so.

G. *Allegations that prison officials knew inmate Kinner was violent in nature and failed to isolate him from other inmates in protective custody*

Many Plaintiffs testified that prison officials knowingly maintained an unsafe living environment by keeping inmate Timmy Kinner housed with them in protective custody, because Kinner posed an immediate and continuing known threat in J-block. For example, Plaintiff Morrison testified:

> Kinner was very aggressive with a lot of people actually. There were a lot of issues with that guy. And I had told cops personally about him making threats and trying to hide in the shower to get people, being at people's doors, threatening him. And he was actually found with some shanks and brought back to the tier two days later. When normally, that's an Ad-Seg situation. You're going to Ad-Seg, or at least the hole for a while. They brought him back two days later.
>
> We asked Sergeant Rowe about it, like, Hey, why is this dude — especially when there's already been issues with this dude trying to like hunt people out and threaten people. And he told people, me and about six others that were

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 21**

> standing there at the bottom of the stairs, and said that it was for his own protection.
>
> What do you mean like this — because he killed a child and people don't like him, he's allowed to have a shank? You're putting us in danger, especially when this dude has made threats, you know. And he was seen on camera trying to hide in the shower. You know, I had notified one of the cops, Hey, this dude is making threats.

Dkt. 136, pp. 248-250.

Morrison continued:

> There's an obvious threat. The dude has gotten aggressive here in front of the cops. It was almost like they protected this dude. He had been to the hole many times for punching people, slapping people…. Kinner was an aggressor…. He's gone into dudes' cells and ripped stuff off the walls and like, yeah, I'm taking this. And nobody wanted to do anything because, for one, the cops were letting this dude basically just roam around and do what ·he wants to do. It was baffling.

Dkt. 136, pp. 250-251.

Plaintiff Kitrell testified: "I told the sergeant at the time, because Kinner was causing all kinds of problems around the unit." Dkt. 135, p. 204. Kitrell told officers about four times that Kinner had a homemade shank, and "eventually, the response [Kitrell] got was administration wants him here, there's nothing we can do about it." *Id*.

Plaintiff Lincoln testified:

> I know he -- there have been multiple times where Kenner would be walking around the day room, I'm going to kill someone. He's had massive mental issues, and he would yell at people before.
>
> I've seen him yell at people and just get in their face. And he had been in quite a few fights there. I have — I've never seen him receive a DOR or anything. But I did see him have—

> they pulled a shank off him once and took him off the tier,
> and they brought him back a few days later.

Dkt. 135, pp. 23-24.

Hodges-Foote testified that Inmate Kinner "had been found at least three different times with homemade knives in his cell or on his person." Dkt. 135, p. 97. He also testified:

> [Kinner] kept saying stuff like he's going to kill someone;
> he's going to kill a staff member; he's going to kill an inmate.
> And it just got to the point where I honestly started to feel like
> why do they keep bringing the same person back on the tier?
> The last time they took a weapon from him, they didn't even
> take any of his stuff or remove him from the tier, they just left
> him there.

Hodges-Foote, Dkt. 135, p. 97.

None of the inmates who testified had been assaulted by Kinner. As noted above, Plaintiff Farley, who refused to testify or file a second amended complaint, had a physical altercation with Kinner in the shower. *See* Exhibit 1. Because this Court is recommending that Farley's claims be dismissed for failure to prosecute, that leaves the Kinner claims as only threat-of-harm claims for the remaining Plaintiffs.

While Plaintiffs voiced past fear of a threat of harm from Kinner, prison officials have transferred Kinner to an out-of-state facility. Without a need for prospective injunctive relief, each Plaintiff must meet the physical injury requirement of § 1997e(e).

## H. *Alleged failure of prison officials to respond to known acts of violence*

Plaintiffs vaguely assert in their Amended Complaints that prison officials generally failed to respond appropriately to acts of violence. Plaintiffs provided testimony about various responses to incidents of violence, as follows:

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 23**

Hodges-Foote testified that another inmate started a fight with Kinner and it took officers about three minutes to respond and break up the fight. Both inmates had bruises and cuts to the face. Hodges-Foote, Dkt. 135, pp. 95-96.

Hodges-Foote testified that, on June 4, 2022, when Inmate Garcia was first being brought into J-1 to live, he attacked Hodges-Foote in the dayroom, and hit him in the head five or six times, saying that a correctional officer told him that Hodges-Foote was a "baby raper."[10] Hodges-Foote, Dkt. 135, pp. 69-74. Officer Knight, who was assisting in the transfer, tackled Garcia to the ground. Exhibit 33. Officers told Hodges-Foote to separate himself near the wall. Hodges-Foote testified that he thought officers acted appropriately in response. Hodges-Foote, Dkt. 135, p. 74. Garcia was taken back to the housing unit he came from. Hodges-Foote was examined by medical staff after the incident. Hodges-Foote, Dkt. 135, pp. 72-73.

Lincoln saw "multiple fights out [his] window … involving Farley." Dkt. 135, p. 17. Lincoln testified that nothing officers did in those instances was inappropriate. Dkt. 135, p. 26.

Laymon fought with Plaintiff Farley in the dayroom. Laymon said it began when he jabbed Farley "on the shoulder, playingly, and he stood up and punched me off the seat in the dayroom. So I got up and started fighting him right back, starting punching him in the

---

[10] While Hodges-Foote did not have complaints about how officers responded to Garcia attacking him, he did complain that an unknown correctional officer placed him in danger by telling Garcia that Hodges-Foote was a "baby raper." Dkt. 135, pp. 78-79. Should Plaintiff discover additional facts about whether this is true and which officer made the remarks, he may pursue a failure to protect claim against that officer. Currently, there are insufficient facts to support a claim, because the defendant is unknown.

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 24**

face." Laymon, Dkt. 135, p. 136. The two fought a couple of minutes. Other inmates told them to stop, and they did. No officers responded, but they came the next day. *Id*., pp. 137-38. Each inmate had a couple of bruises. *Id*., p. 138; Exhibit 2.

Payne testified that the Farley and Dixon fight was next to the kiosk, in front of the windows, where officers could see it. Dkt. 136, pp. 314, 342. The response to the Farley-Dixon fight took between 10 and 15 minutes - "It took them a while. They didn't come running in when it was obvious. I think one of them might have been even watching it happen and not doing anything, if I remember right." Dkt. 136, p. 342. The IDOC incident report shows that this fight was first noticed by an officer in the control center, who activated "ICS" (an acronym not defined in the report), prompting unit staff to report to tier 1; by the time they arrived, the inmates had ceased fighting. Exhibit 4.

Lincoln saw Mackenzie spit on Inmate Rodriguez, then Rodrigues hit him a couple of times. Dkt. 135, p. 33. Lincoln did not think officers handled the incident inappropriately, but treated it as an inmate dispute that was done. *Id*., p. 34.

Hodges-Foote heard Inmate Padilla, who apparently had been drinking, fighting in the cell above him. Officers intervened; Padilla and other inmate were sprayed with OC (oleoresin capsicum). Hodges-Foote, Dkt. 135, pp. 80-81. Hodges-Foote testified that this was an appropriate response to the inmate fight. Dkt. 135, p. 82; Exhibit 24.

Laymon saw Frank Gurell fighting with another inmate. An inmate was choking Gurell in a headlock, and Laymon thought Gurell was going to die. Dkt. 135, p. 154. Laymon didn't press his emergency call button, but thinks "a bunch of people on the tier … probably did." *Id*., pp. 154-155. Laymon described the incident: "The CO's came in,

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 25**

doused them both with mace, didn't do anything…. Dude still had him in a headlock and was not letting go. Doused him again; didn't do anything…. Doused him again; didn't do nothing….So they used physical force to separate them" and it took them "a little while." Laymon thought the officers' response was appropriate. Dkt. 135, p. 155.

Hodges-Foote described the same fight, labeling both inmates as "very violent people." Dkt. 135, pp. 80-86. Hodges-Foote was going to press the emergency button to call for officers as he saw the fight begin, but his cellmate told him not to get involved. *Id*., p. 86. Hodges-Foote said, "[T]hat one, of all of the fights that I've seen on that tier, that one messed my head up the most, seeing all of the blood." *Id*., p. 85.

Kitrell testified that he was in the dayroom and he told inmate Williams, "when you're on the phone, I understand you're going through stuff, but you can't be screaming like that because other people are on the phone." Kitrell testified that Williams "walked away, put his head down, came at me and started swinging." Dkt. 135, p. 191-192. The correctional officers "were on the tier at the time. It still took them a significant amount of time to come separate us." *Id*. Officials sent Kitrell back to his cell. They later put Williams on a separate floor, and Kitrell avoided him after that. Kitrell, Dkt. 135, p. 193.

Morrison testified: "[A]s far as like the fights and stuff, I would say they do pretty good on responding appropriately without, you know, any excessive force or anything." Dkt. 136, p. 255-256.

Several inmates complained that, when they pressed their cell's emergency call button, officers often ignored them. There is no speaker, and so officers do not know what type of request inmates are making when they press the emergency call button. Kitrell, Dkt.

135, pp. 202-03. "Sometimes they don't even come until their next walk" when inmates press their buttons, testified Kitrell, Dkt. 135, p. 202.

Inmates' interpretation of an "emergency" was mixed. For example, Kitrell pressed the button for a clogged toilet and got no response. *Id*. Morrison pushed the emergency call button to let officers know his visitation was coming up in 15 minutes, but no one responded. Dkt. 136, p. 256.

Morrison testified that, once when an inmate had a diabetic seizure, his cellmate pressed the emergency button and got no response, and so Morrison and other inmates on the tier began to kick their doors to draw the attention of the officers. Morrison thought officers came a half hour after the button was pressed, and the medical staff came an additional fifteen minutes after that. Morrison, Dkt. 136, 256-259. The inmate did not suffer injury. *Id*.

Overall, the Court concludes that the testimony of Plaintiffs as to officer response time, including responding to emergency call buttons, does not support a claim of a widespread or repetitive pattern that prison officials do not adequately respond to acts of violence or true emergencies in J-block. While response times may have been delayed in a few instances (which may be actionable by any individuals suffering harm if deliberate indifference appears at issue), there was insufficient testimony to permit Plaintiffs who did not suffer injury because of a response time issue to proceed.

Given the foregoing, the Court recommends that those Plaintiffs who alleged a physical injury from a delayed response be permitted to proceed on any failure to respond claims regarding a specific incident. Those who had no physical injury should not be

permitted to proceed. At a later stage of proceedings, issues of exhaustion of administrative remedies may result in dismissal.

     I.    *Sexual assault incidents*

Plaintiffs allege that rampant sexual assaults occurred in J-block and that prison officials failed to protect inmates from sexual assault in violation of the Eighth Amendment. They also asserted that prison officials failed to take action under the Prison Rape Elimination Act (PREA), formerly 42 U.S.C. § 15601, *et seq.*, now 34 U.S.C. § 30301, *et seq.*

For the following reasons, the Court recommends that Plaintiffs' PREA claims be construed as Eighth Amendment claims that prison officials failed to protect inmates from a serious risk of sexual assault. Congress enacted PREA to address the problem of rape in prison by (1) creating a commission to study the issue and recommend national standards to prevent, detect, and respond to prison rape; (2) applying such national standards to state and federal prisons; and (3) conditioning eligibility for federal grant money to be used for prison rape prevention and safeguarding communities on compliance with national standards. 34 U.S.C. §§ 30304 to 30305.

Acts that fall within PREA include: "rape", which means "the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person" under conditions of non-consent, inability to give consent, or under exploitation of fear or threat; "carnal knowledge" means "contact between the penis and the vulva or the penis and the anus, including penetration of any sort, however slight." 34 U.S.C. § 30309 (1) & (9).

Nothing in the text of PREA suggests that it was intended to create a private cause of action enforceable by individual civil litigants or grant any specific rights to prisoners. *See LeMasters v. Fabian*, 2009 WL 1405176, at *2 (D. Minn. 2009); *Randal v. Weber*, 2008 WL 5448232, at *1 (D. S.D. 2008); *Bell v. County of Los Angeles*, 2008 WL 4375768, at *6 (C.D. Cal. 2008). Particularly, courts have determined that "[n]othing in the PREA suggests that Congress intended to create a private right of action for inmates to sue prison officials for noncompliance with the Act." *Deltona v. Clark*, 2012 WL 4458648 (W.D. Va. 2012) (citing *Ball v. Beckworth*, 2011 WL 4375806, at *4 (D. Mont. 2011) (citing additional cases).

It was clear from Plaintiffs' collective testimony that the number of J-block sexual assaults and whether Plaintiffs actually witnessed such assault was greatly exaggerated in pleadings. Three inmates each testified they heard or knew of one particular incident or set of incidents involving a transsexual inmate:

Lincoln testified that he knew of sexual conduct occurring between inmate Messenger and an inmate who identified as a female who was living with Messenger. "They ended up getting a PREA thing called on them at one point, and I know they got separated because of that. And Messenger said he was getting a DOR." Lincoln, Dkt. 135, pp. 28-29.

Laymon discussed incidents of consensual sex between a transsexual inmate and "her boy toy." Dkt. 135, pp. 161-62. "You can hear it if you are next door neighbors to them," Laymon said. *Id*., p. 162. Laymon never saw a sexual assault. *Id.*

Morrison testified of sexual incidents between a transexual inmate and another inmate that may or may not have been consensual:

> I wish I could remember his name. I know he's over in C block now. I don't know if —I know that person could be very mentally unstable, as well. So I guess, technically, you really couldn't believe everything this person was saying. But I know the person they lived with was — like they were attracted to them. They were almost kind of like a couple, you know. He testified that he heard at least a few instances that from the same couple. And, it was over like a period of about two months. And then the person went to the hole. The trans went to the hole, and they went to C block. So I don't know exactly what happened with all of that. I never heard anything after that…. I never saw anything. I did hear.

Dkt. 136, p. 246-247. Morrison testified generally that he also heard "screaming and stuff like that, you know, yelling, stop." Dkt. 136, p. 245.

Hodges-Foote testified he believed he heard an inmate named Dixon who was being sexually assaulted in his cell:

> "And I could hear him in the middle of the night saying no, stop, stop, stop. And the next day, he just kind of stayed to himself, kind of curled up. Typical, victim kind of stance, for lack of a better word."

Dkt. 135, p. 91. Hodges-Foote testified that neither he nor Dixon reported the sexual abuse to prison officials. Dkt. 135, pp. 92, 100.

Hodges-Foote once reported to a corporal that he witnessed another inmate holding his cellmate down and possibly sexually abusing him. Later, a lieutenant questioned Hodges-Foote and the other two inmates about the report. Hodges-Foote, Dkt. 135, p. 103.

Payne's Complaint alleges he was raped by inmate Wilson on J-block. Payne corrected this allegation and testified that this occurred at a different facility, and he had

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 30**

no idea as to the time frame. Dkt. 136, p. 308; Exhibit 41. At the hearing, Payne testified

that he was not sexually assaulted by any inmate while housed in J-block. *Id.*, p. 305. Nor

did Payne ever witness any sexual assaults while in J-block. Dkt. 136, p. 341.

Based on the testimony of Plaintiffs, the Court finds there are insufficient factual

allegations to show there was or is an excessive risk of sexual assault on J-block, or that

prison officials are ignoring reports or manipulating data.

Lincoln testified that the allegation in his Complaint that "99.1 percent of Prison

Rape Elimination Act complaints appear to be covered up" was not his own. Dkt. 135, pp.

59-60. Lincoln said, "It is just, we never really see them go any further than — other than

a few DOR's is what I've seen come from them." *Id.*, pp. 59-60. Only after making the

determination that Plaintiffs had failed to state a claim, did the Court review Defendants'

sealed exhibits to which Plaintiffs objected that they had not been permitted to review. The

Court reviewed the sealed exhibits detailing the sexual assault incidents and PREA reports

as an additional precaution to see if the IDOC records provided support for Plaintiffs'

allegations.

The information provided shows that the sexual assault cases are thoroughly

investigated and routed to the facility PREA Compliance Manager, who reviews the

investigations and finalizes the findings. *See* Teresa Jones Decl., Dkt. 57-2. The incidents

reported were categorized either as sexual abuse, because, consistent with PREA, they

included allegations of some type of inappropriate touching; or as sexual harassment

outside of PREA, because no inappropriate touching was involved, a definition also

consistent with PREA. A few of the original sexual assault complaints were later confirmed

as false by the complainant during an interview. Other cases were deemed consensual, based on interviews with both inmates. *See* Sealed Exhibits 1 through 10.

When inmates say that they never see PREA allegations go very far, it is unclear what they want to see happen. Inmates testified of prison disciplinary proceedings for persons engaging in sexual acts. In most instances where sexual abuse, verbal sexual harassment, or a fear of sexual assault was reported by inmates, even where the report was deemed "unfounded" after investigation, prison officials nevertheless separated the inmates by moving the inmates into different cells and/or walks.

Based on the foregoing, Plaintiffs have not stated a claim for relief. There are not enough incidents showing that sexual abuse was an unreasonable risk of danger or unchecked when reported, or that a fear of sexual assault went without a remedy in J-block. Plaintiffs—none of whom was sexually assaulted in J-block—have not stated a viable threat of risk of injury claim. Any inmates who were sexually assaulted in J-block have or had opportunity to bring grievances and individual civil rights actions. These Plaintiffs should not be permitted to proceed on this claim, either as a past claim for damages or a future injunctive relief claim.

### 5. Claims of Deprivation of Exercise

#### A. *Past conditions re: exercise*

"[E]xercise is 'one of the basic human necessities protected by the Eighth Amendment.'" *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (quoting *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993)). "[T]he Constitution requires [prison] officials to provide outdoor recreation opportunities, or otherwise meaningful recreation, to prison

inmates." *Norbert v. City & Cnty. of San Francisco*, 10 F.4th 918, 931 (9th Cir. 2021) (citation omitted). In *Norbert*, the Court emphasized that it has never held that "the Eighth or Fourteenth Amendments categorically required exercise to take place outdoors regardless of any indoor recreation options." *Id*.

Nor is there a "bright-line" rule setting forth the amount of time or circumstances under which prisoners may be denied out-of-cell exercise before the deprivation is considered "sufficiently serious" to invoke Eighth Amendment protection. However, the Ninth Circuit has consistently held the "long-term" denial of exercise may violate the Eighth Amendment. *See Lopez v. Smith,* 203 F.3d 1122, 1132–33 (9th Cir. 2000) (en banc) (holding a 6 1/2 week denial sufficient to satisfy the objective component of an Eighth Amendment violation); *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir. 1996), *as amended* 135 F.3d 1318 (9th Cir.1998) (finding triable issues of fact regarding six–month deprivation of exercise).

In *Noble v. Adams*, 646 F.3d 1138, 1143 (9th Cir. 2011), the timing of the deprivation of exercise was at issue: the prison had experienced a major riot, and prison officials gradually eased up the resulting lockdown. The Ninth Circuit Court held that it was not clearly established in 2002—nor in 2011—precisely how, according to the Constitution, or when a prison facility housing problem inmates must return to normal operations, including outside exercise, during and after a state of emergency called in response to a major riot, in which inmates attempted to murder staff. *See also Norwood* v. Vance, 591 F.3d 1062, 1070 (9th Cir. 2010) (rejecting claims that prison officials had no

need to continue exercise restrictions after initial investigation of assaults were completed and finding defendants entitled to qualified immunity).

The lack of dayroom access alone, without an exercise component, does not rise to the level of a constitutional deprivation, nor does it constitute an atypical or significant hardship. *See, e.g., Arsberry v. Illinois,* 244 F.3d 558, 564 (7th Cir. 2001); *Postlewaite v. Godinez*, No. 14-CV-501-JPG, 2014 WL 2892381, at *2 (S.D. Ill. June 26, 2014).

Here, Plaintiffs' testimony was mixed as to whether the lock-ins and lack of indoor/outdoor exercise occurred at the end of the COVID pandemic, or, if after that time frame, how long after the pandemic. The prisoners testified consistently that, for months, persistent lock-ins deprived inmates of the ability to exercise in the dayroom or outside. *Lincoln*, Dkt 135 pp. 12-14.

Morrison testified that when the unit was on "dark days or secured status" they got almost no recreation: "There were a few weeks that we had only got one or two hours out." Dkt. 136, pp. 260-261. Lincoln testified similarly: "We would be lucky to get rec once, twice a week. And then it got worse from there…. To the point where they were just shutting down day rooms for days at a time and letting us out a little bit to shower." Dkt. 135, pp. 42-44.

Kitrell testified that "There was a point we didn't get rec two months straight…. Their excuse was short staff. We couldn't go outside." Dkt. 135, p. 208. Hodges-Foote testified: "We're stuck in our cells for two or three days in a row. No rec. Three meals a day and that's it…. We don't leave our cell, unless it is to shower every three days." Dkt. 135, pp. 105-106. "There were periods of time they kept us locked down and only gave us

showers when they absolutely had to by law." Kitrell, Dkt. 135, p. 210. This occurred in 2021 and the beginning of 2022. And then it started to get better. It had [sic] gotten a lot better. At first it was horrible. We barely went outside." *Id*., p. 209. Morrison said the worst time was from December of 2021 to about the end of 2022, and then it started gradually getting better in the middle of 2022. Dkt. 136, p. 265. Morrison acknowledged he was "worried about bringing that up because a lot of it was towards the end of COVID, you know." *Id*., p. 267.

The inmates testified that exercise was an important part of keeping themselves mentally healthy and being able to more easily avoid confrontations with other inmates caused by excessive time spent together in the close confines of a cell. Morrison testified:

> It makes like being in the cell — a lot of the times, it makes people uncomfortable to like — like if you — I know it doesn't bother me, but it bothers a lot of people when their cellie gets up and paces to kind of move around. So it was basically like a kennel, you know, a dog going back and forth. It kind of makes that person unnerving, nervous and stuff. I've seen dudes call dudes out because of that, you know, like wanting to fight. Like, hey, you're making me nervous, are you trying to fight or something[?]

Dkt. 136, p. 281.

Laymon testified:

> I personally think that if everybody was, at that time, getting their showers, getting rec time, being treated adequately, people's tempers wouldn't have been so hot, period.
>
> Overall, [violence] would have been a lot lower.

Dkt. 135, p. 148. Payne testified that "fights were happening in the cells because we were locked down so much." Dkt. 136, p. 333.

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 35**

Lincoln testified:

> And we would just want to come out and get away from each
> other and decompress and have our time apart, instead of just
> being wound up. I would — I would get aggravated and I'd
> walk and I would pace back and forth and I would punch
> walls…."

Dkt. 135, p. 14.

Morrison, testified of the consequences of not having exercise:

> I got super depressed. I just didn't want to do nothing. I just
> got super in my head about things and had a lot of mental
> health issues come out. And I'm not one to want to like take
> meds and stuff.

Dkt. 136, p. 267.

Generally, in the Spring of 2021 through 2022, staff did not say that the COVID
pandemic caused the lockdowns, but instead they said, "understaffing." Lincoln, Dkt. 135,
pp. 42-44; Laymon, Dkt. 135, p. 149-150. Morrison, Dkt. 136, pp. 260-262.

Liberally construing Plaintiffs' Eighth Amendment lack of exercise claim, the Court
finds that Plaintiffs have stated a claim and recommends that they be permitted to proceed.
Consistent with the law cited above, no separate claims particularly for outdoor exercise or
lack of dayroom time lie. A question for another day is whether the lack of staffing was
caused by the COVID pandemic and its aftermath. IDOC took several steps to address the
unique problems that COVID presented in a custodial setting, including requesting and
receiving the assistance of the Idaho National Guard to fill in staffing shortages. *See* Dkt.
57-2, p. 28, Amanda Gentry Decl. Because prison officials did not have similar past
experience to help them determine their actions during and after COVID, Plaintiffs' claims

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 36**

might be subject to a qualified immunity defense, but that is not an issue for the pleading stage.

There also may be exhaustion or other procedural issues to be addressed at a later date.

### B. *Current conditions re: exercise*

Morrison, the sole remaining Plaintiff living in J-block  testified that, currently, "getting access to the day room" was "pretty reasonable. We don't really have those issues anymore." Dkt. 136, pp. 286-87. Lockdowns occur only two or three times a month because correctional officers call in sick or take vacation time during the holidays. Morrison testified that opportunities to exercise, whether it is outside or in the day room have been "pretty reasonable lately" and "pretty sufficient." *Id*., p. 287. Showers are permitted every two days during normal conditions, and every three days during lockdowns. *Morrison*, Dkt. 136, pp. 285-87.

Morrison testified that not getting outdoor recreation is occurring only "[e]very once in a while, [when] we'll have a day that, hey, we just don't have staff today.… You know, somebody just called in or whatever, you know. But, yeah, it's gotten — it has definitely gotten better now." Dkt. 136, pp. 263-265.

### 6. **Shower Schedules**

Most of the inmates testified that they were being permitted to shower every third day during the worst lockdown periods. For example, Lincoln testified that, during lockdown, it was "every three days at that point, they would let us out" and permit showers.

Dkt. 135, p. 52. Morrison testified that they would get one shower every third day and 30 minutes to an hour in the day room. Dkt. 136, pp. 262-263.

The inmates testified that it was difficult living in closed confines with another male inmate without more frequent showers, especially if the inmates exercised. However, these allegations do not state a § 1983 claim. The Seventh Circuit has found that restricting an inmate to only one shower each week does not rise to the level of a constitutional deprivation. *See Davenport v. DeRobertis*, 844 F.2d 1310, 1316–17 (7th Cir. 1988). The Court recommends that the shower claim be dismissed as failing to state a claim upon which relief can be granted.

### 7. Medical and Mental Health Care Claims

To state an Eighth Amendment lack of medical treatment claim, a plaintiff must allege facts showing that a prison official was "both … aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S. at 837.

Under the Eighth Amendment, "a convicted prisoner is entitled to psychological or psychiatric care for serious mental or emotional illness." *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979). There is "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart." *Id*. (internal citation omitted). The Eighth Amendment claim fails if the need is not serious, or if the defendants have not exhibited deliberate indifference in providing diagnostic services and treatment.

Hodges-Foote testified that, after he was assaulted by Garcia in the dayroom, he sent Health Service Request (HSR) forms and concern forms to the medical unit to request treatment, but he never heard back. Hodges-Foote, Dkt. 135, p. 73.· However, he did hear back on other medical issues, he clarified. Hodges-Foote, Dkt. 135, p. 77.

Payne testified that he was given *some* medical treatment and was prescribed Celexa for anxiety or depression while in J block, but he did not think it really helped. Dkt. 136, p. 336.

Morrison sought treatment for his back, and he saw the medical staff "a few times" for that issue. He was told he would get an x-ray, but that did not happen. He was prescribed treatment with the physical therapist for his back issue. He went once, and then did not attend the second appointment because of a stomach illness. He was never called out again for physical therapy, and when he filed a concern form about it, his concern form was never answered. Morrison, Dkt. 136, p. 282.

Kitrell had an unusual lump on his body, which was evaluated in J-block, but the medical unit did not schedule the recommended ultrasound. Finally, after three months, he received the ultrasound and was told the request was never entered into the system. Dkt. 135, p. 211.

Kitrell testified that he was given his regular medications while on J-block. p. 212. Kitrell also had meniscus problem in both knees. The medical provider told him surgery could wait until after he was released from prison because "there's no reason for the State to have to pay for it if it is not a mandatory, extreme health issue." Dkt. 135, p. 211. It has now been two to three years. *Id*., p. 212.

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 39**

Laymon testified that he had "a bad knee and ankles" from having broken his ankle at a different facility. He asked for wraps and Icy Hot to ease swelling and a refill of 600 mg of Ibuprofen, but during and after COVID, it took many weeks to get these items. A medical provider would tell him to go to sick call, but when he arrived, the staff said they didn't know what he was talking about, but would have to check with his provider—which caused further delay. He ultimately got what he needed, but it took "[m]ore time than was necessary to [remedy] the situation." Dkt. 135, p. 171.

Laymon testified that, "for the most part," he received his psychiatric medications from prison medical staff during his residency in J-block. Dkt. 135, p. 172. He also requested that his preferred clinician, Logan, be assigned to his case, and he saw Logan about every six months. He described Logan as "somebody that I can open up to that's … level with me and understanding." Laymon, Dkt. 135, p. 174.

While in J-block, Lincoln spoke to mental health staff about getting on medication like Cymbalta. He was prescribed medication and meditation exercises, but he did not find either effective. When asked what he wanted the mental health staff to do, Lincoln testified, "I don't know. I don't know what really could have helped, truthfully, honest." Dkt. 135, p. 41. "All of the mental health medications that they've tried putting me on do not work," he said. *Id*., p. 47. He was seeking care "quite a bit," and he never was denied care, but sometimes it would just take medical staff longer to see him again. Lincoln, Dkt. 135, pp. 47-48.

Hodges-Foote received his regular medications while on J-block, including Tegretol for seizures. Dkt. 135, p. 110. Prior to being housed in J-block, he was told that

he should see a mental health professional at least every 30 days, but when he came to J-block, a clinician told him that he was "HMS cleared," meaning that no mental health treatment was needed. After he submitted repeated mental health concern forms, "a mental health clinician finally came out and told [him] and a few others, 'you're not … actually in need of mental health services, you're just trying to scam the system.'" Hodges-Foote, Dkt. 135, pp. 112-113. The clinician told this same thing to "quite a few inmates." Hodges-Foote, Dkt. 135, p. 114. When Payne was in J block, he did see someone for treatment for mental health issues, but he "did not like her at all" and thought that none of the "mental health people there are even qualified." Payne, Dkt. 136, pp. 328-329.

Payne alleged in his Complaint that the stress he was feeling from prison officials not transferring him away from a difficult cellmate caused him to lose vision in his eye. He does not have a medical opinion to support this, but says that "stress is what helped cause my other two strokes because of blood pressure being raised." Dkt., 136, p. 322. Payne admitted: "I don't know if there is a connection at all or — I don't know. Maybe it is wrong to blame it on that. It is hard to say." Dkt., 136, pp. 323-24.

Payne felt like in J-block, which was a protective custody unit, it would take a long time to get medical appointments, and then it was difficult to get the inmates there because it was a special move. "And it was like because we were a PC unit, we didn't matter or something." Dkt. 136, pp. 327. But, eventually they were able to obtain medical care when they used the HSR system. Payne, Dkt. 136, pp. 327-328.

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 41**

The testimony of Plaintiffs did not bear out the vague allegations of the pleadings that inmates housed in J-block as a whole generally received no medical or mental health care while housed in J-block. The inmates' allegations regarding lack of medical and mental health care were varied. There were no sets of allegations showing a widespread pattern of constitutionally-inadequate care, and especially, no pattern of lack of care that extended into the current time period, such that any prospective injunctive relief claims lie.

This is not to say that individual claims could not or cannot be pursued, if sufficient additional facts show that a particular inmate received insufficient medical or mental health care as a result of prison officials' deliberate indifference. This requires a showing that inmates brought their claims to the attention of medical or prison supervisory officials, and the officials failed to act to correct situations that posed a substantial risk of serious harm.

As to individual claims, because private medical and mental health records should not be shared among inmates, the Court recommends that any inmate who desires to pursue these types of claims that occurred between 2021 and 2022, file a separate amended complaint in this case detailing only those allegations—which will preserve their statutes of limitations. These claims can then be severed into individual cases. Plaintiffs should be aware that, if they did not exhaust their claims through the prison grievance system, including grievance appeals, or if they do not have a legal excuse for not having done so, they may suffer dismissal of any such claims at the next stage of proceedings.

### 8.  Issues Related to Gender Orientation

Both Lincoln, who is transgender, and Payne, who is gay, testified as to potential actionable incidents of prison staff treating them differently or ignoring their reported

issues. These issues share some similarities between them, but also have unique characteristics from each other and from all other inmates' complaints. These claims would be better adjudicated in separate suits. Each may file a separate amended complaint for claims from 2021 to 2022 in this action if they decide they have met the procedural hurdles to bring such claims or have adequate legal excuses for not doing so.

### FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES/ FAILURE TO REPORT ASSAULT INCIDENTS TO PRISON OFFICIALS

The PLRA requires prisoners to exhaust all available prison administrative remedies before they can bring their claims in a new or ongoing civil rights lawsuit challenging the conditions of their confinement. 42 U.S.C. § 1997e(a). If a prisoner has failed to exhaust available administrative remedies, the appropriate remedy is dismissal without prejudice. *Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003), *overruled in part on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014) (en banc).

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). Proper exhaustion is required "even where it may appear futile." *Nunez v. Duncan*, 591 F.3d 1217, 1231 (9th Cir. 2010) (quoting *Booth v. Churner*, 532 U.S. 731, 741 (2001)). The exhaustion requirement supports the important policy concern that prison officials should have "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Jones*, 549 U.S. at 204.

However, "inmates are not required to specially plead or demonstrate exhaustion in their complaints," but it must be raised as a defense. *Jones v. Bock*, 549 U.S. 199, 216

(2007). If the defendant initially shows that (1) an available administrative remedy existed and (2) the prisoner failed to exhaust that remedy, then the burden of production shifts to the plaintiff to bring forth evidence "showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172.

Other than filing concern forms about needing to transfer out of a cell with inmate Roa, Lincoln never filed any complaints or grievances while in J-block. Lincoln, Dkt. 135, p. 39. Morrison testified that he never filed a formal grievance at IMSI, mentioning that he thought it took too long just to get responses on normal "kites" (inmate concern forms), such as waiting three or four months to have a cavity filled. Dkt. 136, p. 271-273. Hodges-Foote did not report any sexual assaults, physical assaults or violent attacks in writing while at IMSI. Dkt. 135, pp. 94, 214.

Payne never filed any form or grievance or talked to anybody about any of the assaults on other inmates that he thought were going on. Dkt. 136, pp. 259-260. Nor did he file a grievance for any of his own issues while in J-block:

> I wasn't doing very many grievances. I did as little as possible because it was stressful, number one, just to even try to write anything because of all of the experiences that I had of being, you know, retaliated against or staff's attitude. It was almost just ridiculous.

Payne, Dkt. 136, pp. 339-340.

"There's fights and sexual abuses that [prison officials]don't even know about," testified Hodges-Foote. Dkt. 135, p. 90. Hodges-Foote said he heard noises indicative of a

sexual assault at night several times a week, but he never told anybody about any of it.[11] "I chose to stay out of it because in the type of environment we're in, if you do say something and it gets out that you said something, you're likely to be a victim next," if not from the victim, "then somebody else…. [Y]ou're likely to get attacked just for saying something." Hodges-Foote, Dkt. 135, p. 100.

Laymon testified that he was afraid to file a concern form or grievance because "[a]lmost all of these instances, these are issues that can and will possibly lead to me getting my ass kicked. Excuse my language." Dkt. 135, p. 166. "I'm afraid of my own peers. I have good friends, that if they put it — if they found out that I was doing what I'm doing right now, doing the right thing, and I go back to my tier right now, done. It doesn't matter if I'm on a soft walk or not." Dkt. 135, p. 166.

Kitrell and Lincoln testified that they preferred not to report assaults because they, themselves, would be taken to segregation pending investigation and not have access to their personal property or visitation during that time. Kitrell, Dkt. 135, pp. 216-217; Lincoln, Dkt. 135, pp. 10-11. Kitrell said he was assaulted on J-block in his cell four or five times, Dkt. 135, p. 216, but did not report the assaults. After being physically assaulted twice by the same cellmate, Kitrell had to "basically refuse to house." Dkt. 135, pp. 217-

---

[11] These reports of rampant sexual assaults were not corroborated by any specific facts whatsoever. He testified about only the Dixon sexual assaults and one other sexual assault set forth above in the Section discussing sexual assaults. Adding in the sexual assaults reported in the sealed exhibits does not add up to this frequency. Therefore, this allegation is not plausible. In addition, if no one reports these incidents when they are occurring, and no one files concern forms or grievances, then prison officials are unaware of an existing problem. That is precisely why inmates are required to exhaust their administrative grievances before filing a civil rights lawsuit—so that problems can be solved quickly in the arena in which they arose.

218. In that instance, Kitrell was not taken to segregation; instead they changed his cell assignment. Dkt. 135, pp. 217-218.

Lincoln testified: "We hear about fights happening when they are not reported a lot." Dkt.135, p. 17. "Like I said, with me, I'm not going to report it after the fact that it has already happened, just to get myself in trouble, to get my stuff rolled up and get my stuff taken, you know." *Id.*, p. 35.

Hodges-Foote told this personal story about being confronted by a new cellmate:

> He found I was a sex offender, didn't want me living with him. I said, Well, I can't go anywhere. And he punched me in the face. He said, You're going to go or go in a body bag.
>
> So I told the CO's, Hey, I can't live with him here. As soon as he left, I said, I can't live with him here. They said, okay, cool, back up and be restrained. And they put me in handcuffs and took me to the hole. They treated me as they do every time, that you're at fault for whatever. I know they are doing their job. That's the policy.
>
> They have to take you to the hole, put you under S[P]I, take all your property for 7 days, 7 to 14 days. But at the same time, it feels like you're being victimized more than once…. That's actually the reason why I stopped just reporting anything.

Dkt. 135, pp. 93-94. "[N]o one wants to be put into a situation where they have no property, almost no bedding, and they are in a little cell by themselves." Hodges-Foote, Dkt. 135, p. 103.

It is unfortunate that inmates who report that another inmate assaulted them are themselves quickly segregated during an investigation, and that the victim inmate loses access to their possessions during segregation. However, to keep inmates safe, prison

officials have a legal duty to respond to reported serious risks of harm, and immediate separation is a tool to safeguard the inmate at risk.

In addition, moving at-risk inmates into segregation pending investigation in such instances can be analogized to cases where courts have held that security concerns can justify limiting the rights of prisoners in protective custody. *See French v. Owens*, 777 F.2d 1250, 1256 (7th Cir. 1985); *Allgood v. Morris*, 724 F.2d 1098, 1100–01 (4th Cir. 1984); *see also Hosna v. Groose*, 80 F.3d 298, 305 (8th Cir. 1996); *Griffin v. Coughlin*, 743 F. Supp. 1006, 1019 (N.D.N.Y. 1990) ("Since the court has already held that plaintiffs have not sustained their burden on the claim that the conditions of Clinton PC violate the Eighth Amendment, it follows that plaintiffs cannot prevail on an Eighth Amendment claim premised on the fact that inmates at Clinton PC relinquish certain privileges in return for the safer environment which is available in protective custody.").

Inmate Kitrell voiced a variety of other reasons he did not file concern forms or grievances. Besides saying he preferred not to report incidents to avoid segregation pending investigation, Kitrell said he did not know how to file any kind of grievance. Dkt. 135, p. 214. Kitrell also said that he was "terrified" to file any kind of form of grievance or concern form because he had a misunderstanding with an Officer Juerta, who said something extremely disrespectful about Kitrell's girlfriend. Kitrell "snapped on him, and he ended up taking me to seg. I was terrified to even try and appeal the DOR, let alone deny it, because he was already corporal. Me and him had issues since I was over at ICC." *Id*. However, there is no indication that Officer Juerta had anything to do with any of the incidents at IMSI of which Kitrell could have grieved.

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 47**

A fourth reason Kitrell gave for not having filed any grievances was: "I mean, I get it, yeah, we can grieve on them, but what the heck is that going to do? They get a point on their badge and that's it?" Dkt. 135, pp. 206-208. A fifth reason Kitrell said he did not report the assault incidents to anyone was: "I didn't feel safe to, because like Warden Richardson said, there's no red flags; we're men; we fight; get over it." Kitrell, Dkt. 135, p. 223-224.

In summary, the record reflects that inmates often weigh whether or not to complain of problems to prison officials. Importantly, if prison officials do not know of problems, they cannot address them. Especially where inmates allege that a prison block is more violent than it should be—how would prison officials know the facts needed to be able to remedy it if the total number of incidents is never known? Hence, the PLRA requires exhaustion of administrative remedies, to permit prison officials to be informed of and decide how to address a reported problem. The prison grievance system can be a much faster remedy than a civil rights lawsuit.

As noted above, inmates had a variety of reasons they did not exhaust their administrative remedies in prison. Whether their reasons constitute legal excuses that would permit them to proceed in the absence of exhaustion are questions for another day.

## CLASS ACTION CONSIDERATIONS

One of the questions Judge Winmill asked the Magistrate Judge to address was whether it would be more appropriate under the circumstances for this action to proceed as individual actions or a class action. Rule 23 governs class actions. For several reasons, the Court will not recommend that the action proceed as a class.

**REPORT AND RECOMMENDATION AFTER SPEARS HEARING - 48**

Rule 23(a) sets forth four prerequisites for a class action lawsuit: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. This Rule governs all types of class action suits; prisoner class actions also have other special considerations.

The class of all inmates who live on J-block theoretically is numerous enough for a class action—64 persons; however, because the only remaining claims are past claims, persons who were transferred to J-block after 2022 would not be part of that class. Of the 26 inmates who began pursuing this case, only seven testified at the Spears hearing. And, of those 26 inmates, only one who testified at the hearing remains housed in J-block. While there could be other inmates still in J-block who lived there during the time frames when the violence and exercise problems existed, it is true that many no longer live there, shown by the reduction of the J-block resident complainants down to one inmate in this lawsuit.

Because the current J-block population is not indicative of the population who lived there at the end of COVID through 2022, Rule 23(a)(2) and (3) are not met: common questions of law or fact do not exist among all of the proposed members of the class, and the claims of the representative parties are not typical of the claims of the proposed class.

In addition, as to the claims of violence, most Plaintiffs complain only of the fear of risk of harm, which likely is insufficient to withstand the physical injury requirement of 42 U.S.C. § 1997e(e). It would not be an efficient use of public resources to form a complex class action lawsuit to pursue claims that appear subject to dismissal on procedural

grounds. At the least, those inmates who suffered actual harm should be permitted proceed individually in this action—but there are not enough of them to warrant a class action lawsuit.

As to the exercise claims, Plaintiffs testified that at least some of the lockdown time was during the end of the COVID-19 pandemic, which may have had lingering effects on staffing. It is quite likely that qualified immunity will apply to at least part of the lockdown time, if not all of it. Again, a complex class action suit is not the best forum in which to test the waters of claims that may not be viable.

In addition, most Plaintiffs testified that they did not exhaust their administrative remedies. A few of them voiced reasons that may qualify as legal excuses permitting them to proceed, but most testified frankly that they chose not to report threats or acts of harm because they disagreed with the prison policy requiring officers to immediately segregate them from the harm during an investigation of the reported threat of harm.

While a class action requires only that the named class representatives exhaust their administrative remedies[12] (and it remains to be seen whether any Plaintiff exhausted administrative remedies as to any claim), here, an important policy consideration is that prison supervisors may have solved the alleged violence and fear of violence issues much sooner than they did if multiple inmates had submitted written complaints to the supervisors at the time the issues were happening. An unwieldy class action lawsuit to compensate inmates after the fact would be improper, when most prisoners chose not to

---

[12] *See, e.g.*, *Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004) (stating that one class member's exhaustion "is enough to satisfy [the PLRA's exhaustion] requirement for the class").

alert prison officials about the very problems they now desire to raise in court for the first time.

As to medical and mental health care, Plaintiffs testified that they did receive medical and mental health care. Sometimes it was not to their liking. Sometimes it was delayed. However, there were no common claims across the board that would show the J-block medical and mental health system generally functioned at a level below Eighth Amendment standards and that a class action would be appropriate to enjoin Defendants to provide a better system of medical and mental health care. Because there are no common medical claims, the requirements of Rule 23(a)(2) and (3) are not met—there are no common claims or interests among the proposed class.

The Court recommends that any of the seven remaining inmates be permitted to file a separate complaint for failure to provide constitutionally-adequate medical or mental health care; later, the complaints can be severed into separate actions, a process which preserves the earlier statute of limitations date. But, again, it remains to be seen whether any Plaintiff alerted prison medical supervisors that he was not receiving adequate care through the proper administrative grievance system, or has adequate excuse for the failure to do so.

Further, as to overall class certification, the additional requirements of Rule 23(b) are not met. If the inmates proceed together as co-plaintiffs, there is little risk of inconsistent outcomes or that individual members' claims would be dispositive of the interests of other inmates not a party to this suit, especially because policies, procedures, and injunctive relief are not central issues, but past individualized claims for monetary

damages. *See* Fed. R. Civ. P. 23(b)(1)(A)-(B) & (b)(2). Nor have Plaintiffs shown that questions of law or fact predominate over any questions affecting individual members, or that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy under Rule 23(b)(3).

For all of these reasons, the Court recommends that the request to proceed as a class action should be denied. Rather, the Plaintiffs should be permitted to proceed together as co-plaintiffs on the violence and exercise claims. That way, the parties can pool their evidence to support their joint claims. Plaintiffs with medical claims, mental health claims, or sexual orientation-based claims should be permitted to file separate complaints in this action if they desire to proceed on those individual claims.

## FINAL RECOMMENDATIONS

**IT IS RECOMMENDED:**

1. Plaintiffs Matthew Kittrell, Erik Jon Payne, Kylie Hodges-Foote, Berin Laymon, Daniel Morgan, Joshuah Lincoln, and Johnothon L. Morrison be permitted to proceed together on Eighth Amendment failure to protect claims (all three varieties) and failure to provide exercise claims.

2. Any of the above Plaintiffs who desire to pursue their own medical and/or mental health claims, or harassment or equal protection claims based on sexual orientation, be permitted to file a separate amended complaint raising those claims. After review, any such claims that are permitted to proceed should be severed into individual cases.

3.  Should any Plaintiff desire not to proceed on one or more claims, that Plaintiff be required to file a notice of voluntary dismissal.

4.  The Eighth Amendment claims centering on showering every third day, lack of dayroom time, and specific lack of outdoor exercise beyond simply a general lack of exercise claim be dismissed.

5.  All claims of Casey Farley and Cody Willard be dismissed with prejudice, as they refused to testify at the Spears hearing to testify *or* file a clarifying amended complaint.

## NOTICE TO PARTIES

Within 14 days after being served with a copy of this Report and Recommendations, any party must file their written objections to the proposed findings and recommendations if they desire their objections to be considered.

Thereafter, the district judge will make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. The district judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions. 28 U.S.C. § 636(b)(1)(C); *see also* Fed.R.Civ.P. 72.

DATED: March 4, 2024

Honorable Debora K. Grasham
United States Magistrate Judge